## Central Kentucky Natural Gas Company v. Salyer.

(Decided May 18, 1915.)

Appeal from Johnson Circuit Court.

1. Master and Servant.—Negligence in Providing Insufficient Force —Evidence.—Where an action for injuries to a servant is grounded on failure of the master to furnish sufficient force to move a large and heavy gas pipe, and the weight and size of the pipe and nature of the surroundings were fully shown, the evidence

was sufficient to authorize the submission of the case to the jury on the issue as to whether it could be safely carried by the force employed, although plaintiff offered no direct evidence as to the danger of the operation which resulted in the injury.

2.   Damages—Excessive Damages.—A verdict of five thousand dollars for injuries resulting in the paralysis of plaintiff's right arm and a general impairment of his nervous system, will not be disturbed as found through passion or prejudice.

HAZELRIGG & HAZELRIGG, J. K. WELLS and W. B. WHITE for appellant.

VAUGHAN & HOWES and J. P. HOBSON & SON for appellee.

Opinion of the Court by Judge Hannah.—Affirming.

The Central Kentucky Natural Gas Company appeals from a judgment for five thousand dollars rendered against it in favor of Lum Salyer, in the Johnson Circuit Court, as damages for injuries received by the plaintiff while in the service of the gas company.

.   1.   Appellant's first contention is that the trial court erred in denying its motion for a directed verdict.

It appears from the evidence that the gas company was engaged in laying a line of pipe for the transportation of natural gas through Johnson County; and that it had a force of men digging a trench for the pipe, laying the pipe therein and connecting it, and then refilling the trench. This gas line was being constructed approximately in a straight line, so that when mountains were encountered, the line was required to be laid right up the mountain side.

At the time Salyer was injured they were engaged in laying a line of pipe up a steep grade and across a ravine. The pipe used was ten inches in diameter; and at times it was necessary to bend a joint in order to conform it to the contour of the ground. The joints averaged about twenty feet in length. A certain joint of this pipe, which had theretofore been bent for the purpose of making it fit the trench where it crossed the ravine, had been placed in the trench by the men whose duty it was to so place it. The bend in this joint was about six feet from one end and twelve to fourteen from the other end; and the men who had placed it in the trench got it "wrong end foremost;" that is, the bend in the pipe was in the wrong place, to conform to the contour of the ravine.

This rendered it necessary that the joint of pipe be taken out of the trench and turned end for end. After the joint of pipe had been removed from the trench, the foreman, Shutler, called appellee, Salyer, from his work of filling the trench behind the pipe-laying crew, and directed him to assist in turning the joint end for end.

Salyer testified that he went to where the joint of pipe was to be turned; that one Pickens, who was in charge of the pipe-laying, told him to run both of his arms under the pipe; that he did so, and then Pickens reached under with both of his own hands and grasped Salyer's wrists; that they then proceeded to lift and carry the pipe around; that when this was completed and the weight released from his arm, his right arm was numb; that keen, tingling pains were running through it; and it was shown that subsequently a case of paralysis agitans, commonly known as "shaking palsy," developed in that arm. It was further shown that plaintiff was on the lower side, and that in turning the joint, he was compelled to walk backward, in doing which he stumbled over a stump, which served to throw considerable of the weight of the pipe upon him temporarily.

The evidence was sharply in conflict as to the weight of the joint of the pipe in question, the estimates ranging from 600 to 1,200 pounds.

The same may be said of the evidence as to the number of men actually engaged in turning the pipe, as well as concerning the manner in which this result was effected. Some of the witnesses for the defendant stated that the joint of pipe was turned by using the bend as a base for leverage, and depressing one end, thus raising the other end, and swinging the pipe around as on a pivot, and that if plaintiff was there at all they didn't see him.

Plaintiff introduced some proof to the effect that the usual method of doing this work was to use instruments known as calipers to carry the pipe, requiring twelve men to the joint; but this evidence seems to have had reference more pertinently to the original carriage and placing of pipe in the trench, than to the process of changing a joint end for end.

Plaintiff did not state definitely just how many men were engaged in assisting to carry the joint of pipe; he said there were eight or ten, but could name only five other than himself when questioned further.

While there is no direct proof that an insufficient number of men were used in turning the pipe, this court has held that such proof is not essential.

In C., N. O. & T. P. Ry. v. Black, 157 Ky., 149, 162 S. W., 800, where appellee was injured in assisting another brakeman in carrying a barrel of paint, the court said:

"It is true he introduced no evidence by any witness to the effect that two men could not safely carry such a barrel on such ground; but the nature of the ground and the nature of the package were both fully shown to the jury by the evidence, and the jury were practical men and as qualified to determine when such a barrel could safely be carried by two men as any of the witnesses who were introduced on the trial."

There was sufficient evidence to authorize the submission of the case to the jury; and the trial court properly denied defendant's motion for a directed verdict.

2. It is further contended by appellant that plaintiff's attorney was guilty of improper argument to the jury.

In speaking of the defendant's employes who testified for it, plaintiff's counsel said: "I have heard some corporations have black lists, and when they (its employes) do not do to suit the company, they get rid of them, put their names on the list and send it on to other companies."

This was improper, but the court admonished the jury to disregard it; and we will not say that it was prejudicial. Kentucky Bridge Co. v. Nuttall, 96 S. W., 1131, 29 R., 1167.

3. Appellant also complains of the failure of the trial court to give an instruction offered by it. This instruction was to the effect that even though the jury should believe from the evidence that defendant was negligent, and that its negligence caused an injury to plaintiff's arm, yet if they should further believe from the evidence that the paralysis, if any, resulted by reason of inherited paralysis or inherited tendency toward paralysis, the jury should find for plaintiff damages for the injury to his arm only, exclusive of the paralysis.

However, in an instruction given, the court told the jury to award damages only for injuries suffered and to be suffered by reason of said injury; and we will not assume that the jury found for the plaintiff believing

that the paralysis was not the result of the injury sustained in carrying the pipe. L. & N. v. Kemp's Admr., 149 Ky., 344, 149 S. W., 835.

4. Appellant also insists that the verdict was excessive. Plaintiff was forty-three years of age, and at the time of the injury was a strong, robust man. The evidence shows that his right arm has been destroyed and his nervous system in general impaired; and though the verdict of five thousand dollars is large, we will not say under the rule of law authorizing a reversal on the ground of excessive damages that it ought to be set aside.

Affirmed.